## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. _____

JOEL BENES, JOHN MCCLURE, and DANIEL
VALDES, on behalf of themselves and all others
similarly situated,

      Plaintiffs,

v.

                                   **CLASS ACTION**

LUIS DE LA AGUILERA, AIDA LEVITAN,
BERNARDO B. FERNANDEZ, JR., KIRK
WYCOFF, HOWARD FEINGLASS, and WAYNE
K. GOLDSTEIN,

      Defendants.

_____/

### <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Joel Benes, John McClure, and Daniel Valdes, individually and on behalf of the

class defined herein, file this Class Action Complaint against Defendants Luis de la Aguilera, Aida

Levitan, Bernardo B. Fernandez, Jr., Kirk Wycoff, Howard Feinglass, and Wayne K. Goldstein,

and make the following allegations:

### <u>INTRODUCTION</u>

1.      Corporate directors owe fiduciary duties and obligations to the corporation and its

shareholders. They must ensure, among other things, that the corporation acts within its lawful

authority. They cannot cause a corporation to act *ultra vires*—i.e., to act "'beyond the scope of

power allowed or granted by a corporate charter or by law.'" *Liberty Counsel v. Fla. Bar Bd. of

Governors*, 12 So. 3d 183, 191 (Fla. 2009).

2. The directors of U.S. Century Bank (the "Bank") breached their fiduciary duties, failed in their responsibilities, and caused the Bank to act *ultra vires*, in order to enrich themselves and the private equity funds they represented that held the Bank's preferred stock.

3. Defendants are all current or former members of the Bank's Board of Directors (the "Board"). At least three members were appointed to the Board by virtue of their high-level positions with private equity funds that held a significant share of the Bank's common and preferred stock.

4. In 2021, Defendants breached their fiduciary duties when they devised, approved, and implemented an *ultra vires* transaction to exchange the Bank's preferred stock for common stock. That "Exchange Transaction," effectuated in July 2021, overwhelmingly favored seven private equity funds, including the directors' private equity funds, that held the Bank's preferred stock.

5. Plaintiffs are holders of voting common stock in the Bank. They are "Legacy Shareholders" who founded the Bank twenty years ago as a minority-owned community bank focused on helping the Hispanic community in Miami-Dade County. The *ultra vires* Exchange Transaction dramatically and illegally shifted the economic and voting power in the Bank from these local minority entrepreneurs to large out-of-state private equity funds.

6. In May 2021, Defendants approved the Exchange Transaction notwithstanding the fact that the Bank's governing Articles of Incorporation expressly prohibited the conversion of Class C and Class D preferred stock to common stock.

7. Had they wished to carry out the Exchange Transaction lawfully, the Board should have drafted a proposed amendment to the Articles of Incorporation and submitted that proposal to the common shareholders for a vote. *See* Fla. Stat. § 607.1004(1)(b). Defendants knowingly and

intentionally did not do so. Absent a properly approved amendment, the Exchange Transaction was *ultra vires*.

8.     Plaintiffs' challenge to the *ultra vires* Exchange Transaction arises under Fla. Stat. § 607.0304(2)(b), which provides in relevant part: "A corporation's power to act may be challenged: . . . [i]n a proceeding by the corporation, directly, derivatively, or through a receiver, trustee, or other legal representative, or through shareholders in a representative suit, against an incumbent or former director, officer, employee, or agent of the corporation . . . ."

9.     To guide the Court through the facts set forth below, Plaintiffs attach a timeline of the Bank's authorized shares as **Exhibit A**.

## PARTIES

*Plaintiffs*

10.     Plaintiff Joel Benes is a citizen of the State of Florida residing in Miami-Dade County, Florida. Mr. Benes currently holds 6,500 shares in USCB Financial Holdings, Inc., a bank holding company trading on NASDAQ that wholly owns U.S. Century Bank.

11.     Plaintiff John McClure is a citizen of the State of Florida residing in Miami-Dade County, Florida. Mr. McClure currently holds 1,200 shares in USCB Financial Holdings, Inc.

12.     Plaintiff Daniel Valdes is a citizen of the State of Florida residing in Miami-Dade County, Florida. Mr. Valdes currently holds 12,000 shares in USCB Financial Holdings, Inc.

*Defendants*

1.     Defendant Luis de la Aguilera is a citizen of the State of Florida and served as President, CEO, and a member of the Board of Directors of the Bank at all relevant times. Defendant de la Aguilera was appointed Chairman of the Board of Directors of the Bank on June 28, 2023.

2.      Defendant Aida Levitan is a citizen of the State of Florida and served as a member of the Board of Directors of the Bank at all relevant times. Defendant Levitan served as Chairman of the Board of Directors of the Bank from May 2017 to June 2023.

3.      Defendant Kirk Wycoff is a citizen of the State of Florida and served as a member of the Board of Directors of the Bank at all relevant times. Defendant Wycoff is the managing partner of Patriot Financial Partners II, LP ("Patriot"), which held Class A voting common stock, Class B non-voting common stock, and both Class C and Class D preferred stock.

4.      Defendant Howard Feinglass is a citizen of the State of New York and served as a member of the Board of Directors of the Bank at all relevant times. Defendant Feinglass is the managing member of Priam Capital Associates, LLC ("Priam"), which held Class A voting common stock, Class B non-voting common stock, and both Class C and Class D preferred stock.

5.      Defendant Wayne K. Goldstein is a citizen of the State of New York and served as a member of the Board of Directors of the Bank at all relevant times. Defendant Goldstein is a founding partner of Endicott Opportunity Partners IV, LP ("Endicott"), which held Class A voting common stock, Class B non-voting common stock, and both Class C and Class D preferred stock.

6.      Defendant Bernardo B. Fernandez, Jr., is a citizen of the State of Florida and served as a member of the Board of Directors of the Bank at all relevant times.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over this class action pursuant to the Class Action Fairness Act and 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from at least one Defendant, there are more than 100 members in the proposed Class, and the total amount in controversy in this action exceeds $5,000,000 exclusive of interest

and costs. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

8.      Defendants de la Aguilera, Levitan, Wycoff, and Fernandez are citizens of the State of Florida and subject to the jurisdiction of this Court.

9.      Defendants are subject to the jurisdiction of this Court pursuant to Fla. Stat. § 48.193, because, at all relevant times, they: (a) committed tortious acts within the State of Florida; (b) operated, conducted, engaged in, or carried on a business or business venture in the State of Florida; and (c) engaged in substantial and not isolated activity within the State of Florida.

    i.      Defendants breached fiduciary duties owed to the Bank's Legacy Shareholders residing in the State of Florida and other states.

    ii.     Defendants caused injury to the Bank's Legacy Shareholders residing in the State of Florida and other states.

    iii.    As Board members of a Florida corporation who authorized a transaction involving Florida entities and residents, facilitated by a Florida investment vehicle, Defendants reasonably foresaw the possibility of being haled into a Florida court.

10.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because one or more of the named Plaintiffs resides in this judicial district and it is the place where the *ultra vires* corporate acts and breaches of fiduciary duties occurred.

11.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## GENERAL ALLEGATIONS

**A.**     **Plaintiffs Found U.S. Century Bank As a Minority-Owned Community Bank Focused on Helping Businesses in Miami-Dade County's Hispanic Community**

12.     U.S. Century Bank is a Florida community bank founded in 2002. When the Bank opened, it focused its business on the South Florida community, with an emphasis on the Hispanic community. At the time of the Exchange Transaction, the Bank offered a wide range of deposit and loan products especially catering to the needs of local business owners, entrepreneurs, and households.

13.     When the Bank was founded, it had only one class of voting common stock, and the total number of shares authorized was 10 million shares.

14.     In 2006, the shareholders of the Bank voted to increase the number of authorized common shares to 50 million.

**B.**     **In the Midst of the Great Recession, the U.S. Department of the Treasury Invests More Than $50 Million in the Bank in Exchange for Shares of Newly Created Preferred Stock**

15.     The Great Recession of 2007 to 2009 and beyond had a negative impact on the Bank, as it had on many other financial institutions.

16.     Despite the negative impact of the Great Recession, the United States Department of the Treasury viewed the Bank as one that could survive with an influx of capital.

17.     In 2009, the Department of the Treasury invested $50.2 million in the Bank as part of the federal Troubled Asset Relief Program ("TARP").

18.     In May of 2009, to facilitate an agreement with the Department of the Treasury, the Bank amended its Articles of Incorporation to authorize one million shares of preferred stock to be issued in one or more classes by the Board through appropriate resolutions. This amendment was filed with the State of Florida on July 7, 2009 and is attached as **Exhibit B**.

19.     As part of the Department of the Treasury's TARP investment in the Bank, the Bank adopted two amendments to its Articles of Incorporation, effective August 6, 2009. Each amendment created a new series of preferred stock, together the "TARP Preferred" stock. The first amendment issued 50,236 shares of "Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series A," and the second amendment issued 2,515 shares of "Fixed Rate Non-Cumulative Perpetual Preferred Stock, Series B." The two amendments to the Bank's articles are attached as **Exhibits C and D**, respectively.

20.     Section 6 of the incorporated Standard Provisions of each set of amendments states: "Holders of Designated Preferred Stock shares shall have no right to exchange or convert such shares into any other securities." **Exhibit C**, § 6, at p. A-8; **Exhibit D**, § 6, at p. A-8.

**C.     The Bank's Legacy Shareholders and the Treasury Department Approve a $65 Million Investment in the Bank by Seven Private Equity Funds**

21.     By 2015, the Bank improved its performance well enough to attract outside investors to infuse new capital into the Bank.

22.     To allow for this infusion of new capital, the Department of the Treasury and the Legacy Shareholders approved a series of "Recapitalization Transactions" that set the terms, conditions, and limitations for the new investments and the new investors.

23.     The Bank's status as a minority-controlled community bank was a significant factor for the state and federal regulators who approved the Recapitalization Transactions.

24.     The Legacy Shareholders voted to approve the Recapitalization Transactions in large part because the Legacy Shareholders would end up holding approximately 38% of the Bank's common equity and over 50% of the voting common stock, allowing the Bank to maintain its status as an independent minority-controlled community bank. *See* ¶ 50, *infra*. The Legacy Shareholders also favored the fact that, should there be a sale of the Bank after the Recapitalization

Transactions, the Legacy Shareholders would receive a *pro rata* portion of the proceeds of any sale after the Preferred Stockholders received the initial $114 million. *See* ¶ 49, *infra*.

25.     On or about March 17, 2015, the Department of the Treasury entered into a securities purchase agreement with, *inter alia*, seven private equity funds for the sale of the TARP Preferred stock. The "TARP Preferred Purchase Agreement" is attached as **Exhibit E**. The seven "Private Equity Funds" are: (1) Patriot, (2) Priam, and (3) Endicott—represented by Defendants Wycoff, Feinglass, and Goldstein, respectively—and (4) Greenhill Capital Partners, III, L.P., (5) The Claar Family Spray Trust, (6) Great Hollow International, L.P., and (7) TFO Financial Institutions Restructuring Fund III, LLC.

26.     The TARP Preferred Purchase Agreement was premised on the fact that the Private Equity Funds would invest $52.675 million in new capital in the Bank and would pay the Department of the Treasury $12.325 million for the TARP Preferred stock, for a total of $65 million.

27.     Patriot and Priam were designated "Large Purchasers." Endicott, Greenhill, Claar, Great Hollow, and TFO were designated "Other Purchasers." *See* **Exhibit E**, at p. 3 & Schedule I.

28.     Patriot, Priam, and Endicott—represented by Defendants Wycoff, Feinglass, and Goldstein, respectively—agreed to a series of restrictions on the degree of control that they would exercise over the Bank in order to not be deemed "bank holding companies" under federal law, and to avoid the need to obtain approvals for acquisition of "control" under both federal and Florida law. Essentially, Priam, Patriot, and Endicott committed to being passive investors.

**D.      The Legacy Shareholders Amend the Bank's Articles of Incorporation to Create New Classes of Preferred Stock for the Private Equity Funds Investing in the Bank**

29.      On March 12, 2015, the Legacy Shareholders approved the Recapitalization Transactions by amending the Bank's Articles of Incorporation and superseding all previous Articles of Incorporation and Amendments, thus establishing the terms and conditions for the stock to be issued to the new investors. The 2015 "Amended Articles" of Incorporation are attached as **Exhibit F**.

30.      The Amended Articles created two classes of common stock: Class A voting common stock (50 million shares) and Class B non-voting common stock (8 million shares). **Exhibit F**, art. III.A, at p. 2.

31.      The Amended Articles created five classes of preferred stock: The first two classes—Class A Designated (50,236 shares) and Class B Designated (2,512 shares)—were effectively merged into Class C Designated (52,748 shares). *See* **Exhibit F**, art. III.B.2.(a), at p. 12. The other two classes of preferred stock were Class D Companion (12,309,480 shares) and Class E Undesignated (3,185,024 shares). *Id.*

32.      Patriot and Priam—represented by Defendants Wycoff and Feinglass, respectively—each invested $16,653,199.26 in the Bank ($33.3 million of the $65 million total investment, *see* ¶¶ 37-40, *supra*), and in exchange received the following stock:

|  | **Voting** | **Non-Voting** | **Class C** | **Class D** |
|---|---|---|---|---|
| **Patriot** | 1,905,188 (9.8%) | 3,060,256 (50%) | 16,669 (31.6%) | 3,792,000 (30.9%) |
| **Priam** | 1,905,188 (9.8%) | 3,060,256 (50%) | 16,669 (31.6%) | 3,792,000 (30.9%) |

33.    Endicott (represented by Defendant Goldstein), Greenhill, Claar, Great Hollow, and TFO also invested in the Bank, and in exchange, each received the following stock:

|  | **Voting** | **Non-Voting** | **Class C** | **Class D** |
|---|---|---|---|---|
| **Endicott** | 1,054,290 (5.4%) | 0 | 3,540 (6.7%) | 807,120 (6.6%) |
| **Greenhill** | 1,054,290 (5.4%) | 0 | 3,540 (6.7%) | 807,120 (6.6%) |
| **Claar** | 950,620 (4.9%) | 0 | 3,450 (6.7%) | 807,120 (6.6%) |
| **Great Hollow** | 950,620 (4.9%) | 0 | 3,450 (6.7%) | 807,120 (6.6%) |
| **TFO** | 950,620 (4.9%) | 0 | 3,450 (6.7%) | 807,120 (6.6%) |

34.    A small group of Legacy Shareholders also purchased the remaining available Class D preferred shares.

35.    In addition to the holdings described above, Patriot and Priam both were afforded the right to appoint one member of the Bank's Board. Patriot appointed Defendant Wycoff. Priam appointed Defendant Feinglass. The Bank later added Defendant Goldstein from Endicott as a director. No Legacy Shareholder was appointed to the Board.

36.    As part of the Recapitalization Transactions, the Amended Articles created liquidation preferences for the Class C and Class D preferred stock to enable the new investors to protect their investments in the event of a liquidation, dissolution, or winding up of the Bank. *See* **Exhibit F**, arts. III.B.(e)(iv), III.B.(f)(iv)-(v), at pp. 28-29, 38-39.

37.    The Private Equity Funds received a $114 million liquidation preference for their approximately $65 million investment in the Bank and the purchase of TARP Preferred stock— i.e., in the event of a sale of the Bank, the Preferred Stockholders would receive the first $114 million with the remaining proceeds, if any, divided on a *pro rata* basis among common shareholders.

38.     After the Recapitalization Transactions, the Legacy Shareholders had approximately 38% of the Bank's common equity and over 50% of the voting common stock.

39.     The Amended Articles also created certain redemption rights in the Bank for the Class C and Class D preferred stock. The Class C and Class D preferred stockholders, however, had no right to require redemption or repurchase of the Class C or Class D shares.

40.     The Amended Articles expressly state that Class C shareholders have no right to convert Class C shares into any other securities of the Bank. *See* **Exhibit F**, art. III.B.(e)(v), at p. 29.

41.     The Amended Articles further expressly state that the Class C and Class D shareholders "shall not have any rights, preferences, privileges or voting powers or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or in the Articles of Incorporation or as provided by applicable law." *See* **Exhibit F**, arts. III.B.2.(e)(xi), III.B.2.(f)(xii), at pp. 33, 43.

42.     The Amended Articles do not authorize the directors to exchange or convert Class C or Class D preferred stock to common stock.

43.     Specifically, in Article III, Section B, the Amended Articles authorize the directors to create new classes of stock and to create certain rights, including conversion rights, for the new classes, but do not authorize the directors to engage in transactions to exchange or convert the existing classes of preferred stock into voting or non-voting common stock.

**E.     The Board's First Attempt to Effect an Exchange Transaction**

44.     In early 2018, the Bank's Board—which included directors representing three of the Private Equity Funds—attempted to engage in a conversion of preferred stock to common stock. Patriot, Priam, Endicott, and the other Private Equity Funds sought to maximize their investment in the Bank by exchanging their Class C and Class D preferred stock to voting common

stock at the liquidation preference value. Such an exchange would increase the percentage of voting common stock held by the Private Equity Funds.

45.     At the time, the Private Equity Funds collectively owned 94.6% of Class C preferred stock, 92.7% of Class D preferred stock, and 45.1% of Class A voting common stock. Patriot and Priam owned 100% of the Class B non-voting common stock.

46.     By converting their Class C and Class D preferred stock to voting common stock, the Board could arrange a sale of the Bank that was more profitable for the Private Equity Funds.

47.     Generally, private equity firms raise funds and manage these monies to yield favorable returns for their shareholder clients, often with an investment horizon of between four and seven years. The ultimate goal of the Private Equity Funds here was no different—to sell their stock in the Bank for the maximum amount they could arrange, and as fast as possible.

48.     The Board's 2018 attempt to engage in a conversion never occurred. In November 2018, a number of Legacy Shareholders filed a direct action in Florida state court. *See Rasco v. Levitan*, No. 2018-038212-CA-01 (Fla. 11th Cir. Ct.). In November 2018, and again in April 2019, the Florida court issued orders temporarily enjoining the proposed exchange transaction. The Florida court dismissed the case and dissolved the injunction in May 2020. The state court's November 2018, April 2019, and May 2020 orders are attached hereto as **Exhibits G, H, and I**, respectively.

**F.      The Board Tries Again and, this Time, Completes the *Ultra Vires* Transaction Concurrent with the Bank's July 2021 Initial Public Offering**

49.     Undeterred, the Board attempted another exchange transaction. Motivated by self-interest and with the goal to benefit the Private Equity Funds at the expense of the Legacy Shareholders, Defendants on the Board approved the Exchange Transaction. The transaction

occurred concurrently with the Bank's July 2021 initial public offering ("IPO") of Class A common stock.

50.     On May 28, 2021, the Bank's president, Defendant Luis de la Aguilera, distributed to all of the Bank's preferred shareholders the "Letter of Transmittal," attached hereto as **Exhibit J**, along with the "Offer to Exchange," attached hereto as **Exhibit K**.

51.     The Offer to Exchange provides, in relevant part, that:

> U.S. Century Bank (the "**Bank**," "**we**" or "**us**"), a Florida state-chartered banking corporation, hereby offers to exchange, upon the terms and subject to the conditions set forth in this Offer to Exchange (as it may be amended or supplemented from time to time, and together with any appendices hereto, this "**Offer to Exchange**") and in the accompanying Letter of Transmittal (as it may be amended or supplemented from time to time, the "**Letter of Transmittal**" and, together with this Offer to Exchange, the "**Offer Documents**"), **(i) *each properly submitted share of the Bank's Class C Non-Voting, Non-Cumulative Perpetual Preferred Stock* (the "Class C Preferred Stock") *that you hold in exchange for certain number of shares of the Bank's Class A common stock* (the "Class A common stock") (subject to certain limitations described in this Offer to Exchange), *and (ii) each properly submitted share of the Bank's Class D Non-Voting, Non-Cumulative Perpetual Preferred Stock* (the "Class D Preferred Stock" and, together with the "Class C Preferred Stock," the "Preferred Stock") *that you hold in exchange for certain number of shares of the Bank's Class A common stock* (subject to certain limitations described in this Offer to Exchange), *in each case at an exchange rate determined by dividing (i) the amount of liquidation preference of the applicable Preferred Stock that is submitted by (ii) the public offering price per share of Class A common stock (the "IPO Price") in the Bank's initial public offering of Class A common stock (the "IPO").* The estimated range of the IPO Price, together with a draft of the offering circular for the IPO (the "IPO Offering Circular"), will be included in a supplement to this Offer to Exchange (the "Supplement"), which we will send to you at least 10 business days prior to the Expiration Date.

**Exhibit K**, at p. i (emphasis added).

52.     The Offer to Exchange further states: "If your Preferred Stock is submitted and accepted for exchange by [the Bank], you will receive the applicable amount of Class A common stock . . . in accordance with the Exchange Rates, but you will forgo all rights and benefits

associated with ownership of such Preferred Stock that are not provided to holders of Class A common stock." **Exhibit K**, at p. 16.

53.     The Offer to Exchange provides that any untendered preferred stock will be "redeemed by [the Bank]" "for cash, at the stated liquidation preference." **Exhibit K**, at p. 16 (emphasis deleted).

54.     The Offer to Exchange stated its purpose and effect: "Management of the Bank and the Board believe that the exchange of the Preferred Stock for Class A common stock pursuant to the Exchange Offers will benefit the Bank by creating a more simplified capital structure that will facilitate [the Bank's] IPO, allowing [the Bank] to harmonize [its] capital structure consistent with other similarly sized community banks that are publicly traded. Effecting the Exchange Offers in connection with the [Bank's] IPO also allows [the Bank] to independently establish the Exchange Rates for the Exchange Offers based on the market price at which [the Bank's] shares of Class A common stock are sold to the public." **Exhibit K**, at p. 10.

55.     The Offer to Exchange stated that "***[p]articipants in the Exchange Offers will experience immediate and substantial dilution in the book value of their investment in Class A common stock***." **Exhibit K**, at p. 15.

56.     The Offer to Exchange further states that "[t]he exercise of outstanding options and the issuance of additional securities by [the Bank] could result in further dilution" of Class A common stock. **Exhibit K**, at p. 15.

57.     The Offer to Exchange "reserved" "6,121,052 million Class A voting common shares . . . for future issuance for the potential conversion of [the Bank's] outstanding Class B common stock and exercise of stock options that have been granted by [the Bank]." **Exhibit K**, at p. 15. At the time of the Exchange Transaction, the two largest Private Equity Firms, Patriot and

Priam, owned all 6,121,052 shares of Class B non-voting common stock. *See* ¶¶ 44, 57, *supra*; *see also* **Exhibit K**, at p. 19 (noting that "[a] significant percentage of [the Bank's] Class A common stock, Class B common stock, and outstanding Preferred Stock" was held by Patriot and Priam).

58.     At the time of the Exchange Transaction, the Legacy Shareholders had almost 9.5 million Class A voting common shares. Thus, the Exchange Transaction, which also resulted in Patriot and Priam's Class B shares being converted to Class A voting common shares, resulted in the dilution of over two-thirds of the value of the Legacy Shareholders' common stock and voting power.

59.     In addition, the Offer to Exchange disclosed an agreement between the Board and Patriot and Priam that gave each of the latter two the right to designate one Board member and also "to designate one non-voting Board observer." **Exhibit K**, at p. 22.

60.     Despite their fiduciary obligations to all shareholders, Defendants approved the *ultra vires* Exchange Transaction, which placed the interests of the Private Equity Funds above those of the Legacy Shareholders.

> **G.     Because the Bank's Governing Articles of Incorporation Did Not Authorize the Conversion of Class C and Class D Preferred Stock to Common Stock, the Exchange Transaction Was *Ultra Vires***

61.     The Amended Articles do not permit the conversion or exchange of Class C and Class D preferred stock absent common shareholder approval. The Exchange Transaction was therefore *ultra vires*.

62.     Article III, Subsection B.1 of the Amended Articles provides:

> Subject to applicable law, to these Article of Incorporation and to the Corporation's Bylaws, the Board of Directors is authorized, at any time or from time to time, to issue Preferred Stock and: (i) to provide for the issuance of shares of Preferred Stock in one or more classes or series, and any restrictions on the issuance or reissuance of any additional Preferred Stock; (ii) to determine the designation for any such classes or series by number, letter or title that shall distinguish such classes or series from any other classes or series, respectively, of Preferred Stock; (iii) to establish from time to time the number of shares to be included in any such class or series, including a determination that such class or series shall consist of a single share, or that the number of shares shall be decreased (but not below the number of shares thereof then outstanding); and (iv) to determine with respect to the shares of any class or series of Preferred Stock the terms, powers, preferences, qualifications, limitations, restrictions and relative, participating, optional or other special rights of the shares of such class or series of Preferred Stock . . . .

**Exhibit F**, at p. 11.

63.     The only reference to conversion or exchange of Class C preferred stock appears in the Amended Articles at Article III.B.2.(e)(v): "Conversion. Holders of Designated Preferred Stock shares shall have *no right to exchange or convert such shares into any other securities of the Corporation*." **Exhibit F**, at p. 29 (emphasis added).

64.     Moreover, the provisions governing the rights of Class C and Class D preferred stock contain identical provisions limiting the rights of holders:

> Other Rights. The shares of [Designated or Companion] Preferred Stock shall not have any rights, preferences, privileges or voting powers or relative participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or as provided by applicable law.

**Exhibit F**, arts. III.B.2.(e)(xi), III.B.2.(f)(xii), at pp. 33, 43.

65.     The Bank's governing documents did not authorize Defendants to approve a conversion or exchange of preferred stock to common stock without amending the Articles of Incorporation and submitting the proposed amendment to a vote of the common shareholders.

66.     Defendants' approval of the Exchange Transaction contravenes the Amended Articles; constitutes an *ultra vires* act; was a breach of fiduciary duties owed to Plaintiffs and the other Legacy Shareholders; and violated Fla. Stat. § 607.1004(1)(b), which required the Exchange Transaction be put to a shareholder vote.

67.     Defendants, all current or former directors of the Bank, approved or caused to be approved the Exchange Transaction even though the Amended Articles did not authorize directors to approve a transaction converting or exchanging existing preferred stock to common stock.

68.     Defendants' approval and implementation of the Exchange Transaction constitutes a breach of their fiduciary duties to the Bank's Legacy Shareholders, because the Exchange Transaction favored the Private Equity Funds preferred stockholders over the Legacy Shareholders and diluted the value of the Legacy Shareholders' common stock holdings through *ultra vires* acts.

69.     The Exchange Transaction directly conflicts with the Amended Articles' design to protect the Legacy Shareholders from overreaching by the Private Equity Funds.

## H.     The Bank's Board Continues to Take Actions Designed to Favor the Private Equity Funds at the Expense of the Legacy Shareholders

70.     Defendants continue to favor the Private Equity Funds that held the preferred stock—at the expense and to the detriment of the Legacy Shareholders.

71.     Most recently, on April 17, 2023, the directors instructed USCB Financial Holdings, Inc. ("USCB") to issue a proxy statement related to USCB's annual meeting held on May 22, 2023, which is attached hereto as **Exhibit L**. The proxy statement includes a recommendation by Defendants encouraging the shareholders to vote in favor of an amendment to USCB's Articles of Incorporation that will change the conversion factor of USCB's Class B non-voting common stock from one-for-five to one-for-one. **Exhibit L**, at pp. 31-32.

72.     There are no Class B non-voting stocks outstanding. This is because the alleged rationale for the illegal Exchange Transaction described above was to make the Bank's shares more marketable for the public markets by having only one class of shares.

73.     That tune has now changed because it is clear that the Private Equity Funds the Defendants' favor are not in compliance with "regulatory requirements applicable to such shareholders under state and federal banking rules and regulations, [and] may need or desire to exchange shares of Class A Common Stock for shares of Class B Common Stock." **Exhibit L**, at p. 32.

74.     Consequently, Defendants recommended that the shareholders vote to allow those preferred Private Equity Funds to divest their voting shares, allowing them to come into regulatory compliance, without any penalty or consequence, all while changing the entire capital structure of the Bank in spite of Defendants' previous position that the preferred capital structure (to the public markets) should only include one category of shareholders.

75.     At the Bank's May 22, 2023 annual meeting, the shareholders adopted the proposed amendment to the USCB Articles of Incorporation. The amendment was filed with the State of Florida on May 24, 2023 and is attached hereto as **Exhibit M**.

## CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring this class action and seek to certify and maintain it as a class action under Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the Class.

### The Class

77.     Plaintiffs define and will seek certification of the following Class:

> All record holders of voting common stock in U.S. Century Bank prior to March 14, 2015 who were also holders of Class A voting common stock in U.S. Century Bank when U.S. Century Bank authorized an exchange of Class C and Class D preferred stock to Class A voting common stock in June/July 2021.

78.     Excluded from the Class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Plaintiffs' counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

79.     Plaintiffs reserve the right to modify, expand, or amend the definition of the proposed Class following class certification discovery and before the Court determines whether class certification is appropriate.

80.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

### *Requirements of Rule 23(a)*

#### Numerosity

81.     This action satisfies the numerosity requirement of Fed. R. Civ. P. 23(a)(1). There are over 300 shareholders in the proposed Class. Accordingly, the size of the Class makes joinder of the individual members impracticable.

**Commonality**

82. This action satisfies the commonality requirement of Fed. R. Civ. P. 23(a)(2). Plaintiffs' claims raise questions of law and fact common to the Class. The common questions of law and fact include, but are not limited to, the following:

      a.      Whether Defendants caused the Bank to engage in *ultra vires* conduct by devising and approving the Exchange Transaction despite the fact that the governing Articles of Incorporation expressly prohibited conversion of Class C and Class D preferred stock to common stock.

      b.      Whether the Exchange Transaction was an *ultra vires* corporate act.

      c.      Whether Defendants committed breaches of the fiduciary duties they owed to the Bank, Plaintiffs, and the Bank's Legacy Shareholders by causing the Bank to act *ultra vires*, favoring the holders of preferred stock over the holders of voting common stock.

      d.      Whether Defendants committed breaches of the fiduciary duties they owed to the Bank, Plaintiffs, and the Bank's Legacy Shareholders by failing to act in the best interest of the Bank, the common stockholders, or the stockholders as a whole.

**Typicality**

83. This action satisfies the typicality requirement of Fed. R. Civ. P. 23(a)(3). The claims asserted by Plaintiffs are typical of the claims of the Class. Plaintiffs have suffered harm that stems from the same course of conduct. That conduct gives rise to the Class's claims, which are based on the same legal theories and interests and depend on resolution of the same defenses to liability.

**Adequacy of Representation**

84.     This action satisfies the adequacy of representation requirement of Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent the interests of the Class, and they do not have any conflict with the interests of the other members of the Class that would preclude them from serving as representatives. Plaintiffs have the same interests as members of the Class and will fairly and adequately look out for and protect the interests of absent Class members.

85.     Proposed class counsel are sufficiently experienced in complex litigation and class actions and have the qualifications and abilities necessary to adequately represent the interests of the Class.

***Requirements of Rule 23(b)(3)***

**Predominance**

86.     This action is appropriate for class treatment pursuant to Fed. R. Civ. P. 23(b)(3). As set forth in paragraph 94, *supra*, there are questions of law and fact common to Plaintiffs' claims and the claims of each member of the Class. Those common questions of law and fact predominate over any questions of law or fact affecting only individual members of the Class.

87.     The Class will present common proof as to Defendants' liability, including, but not limited to, Defendants' approval and implementation of the *ultra vires* Exchange Transaction and breaches of their fiduciary duties.

**Superiority**

88.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class certification in this matter would aid in case management and the efficient use of limited resources. A class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decisions as to persons similarly situated

without sacrificing procedural fairness.

***Issue Certification***

89.     This action is appropriate for issue certification pursuant to Fed. R. Civ. P. 23(d)(4)(A). Plaintiffs' proposed Class seeks certification of a particular legal issue—namely, whether Defendants approved the *ultra vires* Exchange Transaction and breached their fiduciary duties to the Bank, the Legacy Shareholders, and the common stockholders.

<u>COUNT I</u>

<u>THE EXCHANGE TRANSACTION IS *ULTRA VIRES*</u>

**(Against all Defendants)**

90.     Plaintiffs re-allege and incorporate by reference paragraphs 1 to 101, as if fully set forth herein.

91.     Defendants caused the Bank to engage in *ultra vires* conduct by devising and approving the Exchange Transaction despite the fact that the governing Articles of Incorporation expressly prohibited conversion of Class C and Class D preferred stock to common stock.

92.     The Bank's Amended Articles expressly prohibited the exchange or conversion of Class C shares into any other securities of the Bank (such as common stock) and expressly denied to Class C and Class D preferred stockholders any rights, privileges, or preferences other than those set forth in the Amended Articles (such as exchanging Class D preferred stock for common stock). *See* **Exhibit F**, arts. III.B.2.(e)(v), III.B.2.(e)(xi), III.B.2.(f)(xii), at pp. 29, 33, 43.

93.     On or about May 28, 2021, Defendants approved, or caused to be approved, the Bank's decision to offer Class C and Class D preferred shareholders the opportunity to convert Class C and Class D preferred shares into voting common shares.

94.     Article III.B.2.(e)(v) of the Amended Articles expressly prohibited the conversion of Class C preferred stock:

> Holders of Designated Preferred Stock shares [Class C] shall have no right to exchange or convert such shares into any other securities of the Corporation.

**Exhibit F**, at p. 29.

95.     Article III.B.2.(e)(xi) of the Amended Articles restricted the rights of Class C preferred stock to those rights expressly provided in the Bank's Amended Articles or bylaws:

> <u>Other Rights</u>. The shares of Designated Preferred Stock [Class C] shall not have any rights, preferences, privileges or voting powers or relative participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or as provided by applicable law.

**Exhibit F**, at p. 33

96.     Article III.B.2.(f)(xii) of the Amended Articles restricted the rights of Class D preferred stock to those rights expressly provided in the Amended Articles or by law:

> <u>Other Rights</u>. The shares of Companion Preferred Stock [Class D] shall not have any rights, preferences, privileges or voting powers or relative participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or as provided by applicable law.

**Exhibit F**, at p. 43.

97.     To carry out a conversion of Class C and Class D preferred stock to common stock, the Board was required to submit a proposed amendment to the Amended Articles and submit that proposal to the common shareholders for a vote. *See* Fla. Stat. § 607.1004(1)(b). Defendants did not do so. The Exchange Transaction was therefore *ultra vires*.

## COUNT II

## BREACH OF FIDUCIARY DUTY

### (Against all Defendants)

98.    Plaintiffs re-allege and incorporate by reference paragraphs 1 to 101, as if fully set forth herein.

99.    As the Bank's Board members, each Defendant owes fiduciary duties to the Bank, Plaintiffs, and all of the Bank's common stockholders. These duties include, without limitation, duties of good faith, care, and loyalty.

100.    Defendants' fiduciary duties require them to act in the best interests of all of the stockholders, and not in favor of the interests of preferred stockholders over those of the Legacy Shareholders.

101.    Further, by virtue of the fiduciary duties they owe the common stockholders, Defendants are required to (a) adhere to the Amended Articles and not approve *ultra vires* transactions; (b) act in the best interests of common stockholders; and (c) avoid acting in their own self-interests when conflicts exist.

102.    The conduct, acts, and omissions described herein demonstrate that Defendants committed breaches of the fiduciary duties they owed to the Bank, Plaintiffs, and the common stockholders by causing the Bank to act *ultra vires*, favoring the holders of preferred stock over the holders of voting common stock, and failing to act in the best interest of the common stockholders, causing them direct harm and special injury.

103.    As a result of the Defendants' actions detailed above, Plaintiffs have suffered economic losses through the dilution of the value of their common stock. Because of the approval and implementation of the Bank's *ultra vires* actions and Defendants' breaches of their fiduciary

duties, Plaintiffs and the common stockholders have been directly, specially, and proximately injured.

## PRAYER FOR RELIEF

**WHEREFORE**, Joel Benes, John McClure, and Daniel Valdes, individually and on behalf of the Class, demand judgment against Defendants Luis de la Aguilera, Aida Levitan, Bernardo B. Fernandez, Jr., Kirk Wycoff, Howard Feinglass, and Wayne K. Goldstein for remedies including, but not limited to, the following:

a.  Declare this action to be a proper class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the Class;

b.  Designate and appoint Class Representatives and Class Counsel;

c.  Award Plaintiffs and Class Members damages in an amount to be proven at trial;

d.  Award Plaintiffs and Class Members their reasonable attorneys' fees and costs, as allowed by law;

e.  Award Plaintiffs and Class Members pre-judgment and post-judgment interest, as provided by law; and

f.  Award Plaintiffs and Class Members any further and different relief as this case may require or as determined by this Court to be just, equitable, and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: July 5, 2023

Respectfully submitted,

*/s/ Jorge L. Piedra*
Jorge L. Piedra (FBN 88315)
jpiedra@kttlaw.com
Harley S. Tropin (FBN 241253)
hst@kttlaw.com
Javier A. Lopez (FBN 16727)
jal@kttlaw.com
Daniel DiClemente (FBN 1025369)
ddiclemente@kttlaw.com
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Boulevard, 9th Floor
Miami, FL 33134
(305) 372-1800

*Counsel for Plaintiffs*